Diana and Randall Clark filed a complaint in the Circuit Court of Jackson County against Mobile Home Brokers, Inc., a corporation, for breach of an implied warranty of merchantability (Title 7A, Section 2-314, Code of Alabama 1940 [Recomp. 1958]). The warranties allegedly were made when Mobile Home Brokers sold, through their agent Crestview Mobile Homes, a new Olympic mobile home to the Clarks. Trial was had before a jury, and, at the close of the evidence on behalf of the Clarks, the mobile home company moved for a directed verdict; the motion was denied. The jury returned a verdict in favor of the Clarks for $8,500. Mobile Home Brokers' motion for judgment n.o.v. or for a new trial was overruled. Mobile Home Brokers appeals.
Two questions are presented to this court for decision. The first is whether the trial court erred by not excluding Randall Clark's testimony regarding the fair market value of the mobile home with the latent defects at the time and place of acceptance. The second question is whether there is insufficient evidence to uphold the jury's verdict of $8,500.
The evidence shows that on May 14, 1975 Randall and Diana Clark purchased an Olympic double-wide mobile home, serial number 0660, from Crestview Mobile Homes, the agent of the defendant below and appellant here, Mobile Home Brokers, Inc. The Clarks inspected the mobile home three times before the purchase. They moved into the mobile home in the latter part of June 1975, whereupon the mobile home began to deteriorate.
The drawers in the kitchen fell apart and the doors to the kitchen cabinets fell off; the upper cabinets were improperly braced and began to sag and pull away from the wall. Water stains appeared in the ceiling where the two portions of the double-wide mobile home were joined. During rains, water leaked around the windows in the living room, two bedrooms, and possibly the bathroom, and around the door in the kitchen. This water mildewed the carpet in the living room and bedrooms and damaged the vinyl floor covering in the kitchen and bathroom. The presswood flooring beneath eventually rotted; as a result one leg of the couch in the living room fell through the floor, one leg of a baby bed in one of the bedrooms fell through the floor, and another hole developed at the door in the kitchen. The bathtub in one bathroom was not braced, so that the tub pulled away from the wall when an adult stepped inside; when the Clarks took showers, water ran into the crack between the wall and the tub and beneath the tub.
The purchase price paid by the Clarks for the mobile home was $10,976. An expert witness called by the Clarks testified that in his opinion, based on the book value of the mobile home, the fair market value of the mobile home when purchased was $8,695.
An expert called by Mobile Home Brokers said he examined the mobile home in November 1975, which was five months after the Clarks moved into the mobile home. He said that at that time it would have cost between $300 and $500 to repair the defects he observed. Mr. Clark said it could have cost as much as $2,000 to repair the defects in the mobile home.
When asked whether he had an opinion as to the fair market value of the mobile home with the latent defects at the time it was purchased by the Clarks, the expert called by the Clarks responded that the value would have been $3,050. However, on cross-examination he stated that the $3,050 figure was the fair market value of the mobile home on August 31, 1976, three days before trial, rather than the fair market value of the mobile home with its latent defects on May 14, 1975, the day the Clarks purchased the mobile home. The trial judge excluded the expert's testimony regarding the $3,050 figure.
Mr. Clark then said that he would not have paid more than $4,000 for the mobile home had he known of the defects at the time of purchase. On cross-examination he said he would not have purchased the mobile home had he been aware of the defects. *Page 1158 
After further cross-examination the following occurred:
 "Q Your opinion? Did the fact that Mr. Byrd's notes and the book that he had have anything to do with that?
 "A No; I'm going on the assumption if I bought it with the defects; if I had money in my pocket to repair the trailer, then I could have made it livable if I had money in my pocket at that time.
 "Q When we talk about repair, you're talking about as it is today then, is that what you're talking about? You're saying it's worth three or four thousand as it is today?
"A With the same defects it has in it today.
 "Q This is a little bit confusing, but what I'm wanting to know is what is, when this three to four thousand dollars, well, of course, you have sued on breach of an implied warranty. I know your lawyer made that decision and did that. But, all right, on the day you bought it, you didn't have all this damage that is done to it now, did you?
"A No.
 "Q Now, is your estimate of value taking into consideration all this damage that now exists?
 "A I'm going under the assumption I never seen the trailer before and I never knew about it at that time, that I knew there was anything wrong with it. I couldn't really say what I think of that trailer now, knowing that, like how much it's leaked inside and what damage is done. I'm going by the assumption if I walked up to the trailer and looked through it.
"Q Today?
"A Today; yes.
"Q And not the day you bought it?
 "A Well, you're the one that said the day I bought it. If it had the same defects, —
 "MR. HARALSON: He's already answered the question, Your Honor. Now, Mr. Baker is trying to get him confused. It's the same ploy used before.
"THE COURT: This is cross examination.
"CONTINUATION BY MR. BAKER:
 "Q You have used this figure, three to four thousand dollars. I want you to tell me in your own words without me trying to trick you, but by asking questions, tell us what you mean and when and at what point do you mean that condition for three or four thousand dollars.
 "[A] I'm saying if I never seen that trailer before in my life and I walked up to it, with the condition it's in today, I might put it in that price range.
 "MR. BAKER: Your Honor, based on that answer, we move to exclude his previous testimony as relates to damages in the difference in market value.
"THE COURT: Overruled.
"MR. BAKER: We Except."
Mr. Baker, counsel for Mobile Home Brokers, next questioned Mr. Clark about the defects which appeared in the mobile home before returning to the subject regarding market value of the mobile home at the time it was purchased by the Clarks. The following interchange occurred:
 "Q Now, it's my understanding, were these things, these eight things, on July, well, the day you bought this trailer, if these eight things was all that was wrong with it, do you know what, — and you had known it was wrong with it on that occasion, can you tell us what would have been the market value of that mobile home the day you bought it or took possession of it?
 "A I don't know; just those eight things, I would say five or six thousand, maybe; I don't know; I couldn't really say; its my opinion.
 "Q So you're saying it would cost $5,000.00 to fix these eight things?
"A I don't know.
 "Q All right, do you really know what the market value would have been with these defects?
"A No. *Page 1159 
 "Mr. Baker: Your Honor, we move to exclude his testimony about the market value.
"THE COURT: Overruled."
As regards the first issue, Mobile Home Brokers claims the trial court erred in not excluding Mr. Clark's testimony as to the fair market value of the mobile home at the time and place of acceptance when, according to its brief, Mr. Clark "later admitted that that was not his testimony and that he did not know the fair market value at the time and place of acceptance." As support for its contention, Mobile Home Brokers relies on Bradford v. Harris, 34 Ala. App. 15, 37 So.2d 675,aff'd, 251 Ala. 386, 37 So.2d 677 (1948).
The principle enunciated in Bradford, as we understand it, is that a witness's testimony should be excluded if it becomes apparent later in the progress of the trial that the witness did not possess competent knowledge and information upon which to base his or her testimony, i.e. the witness did not testify from personal knowledge. In that case the witness testified to the reasonable market value of a car before it was pulled out of a sinkhole. However, upon further questioning it appeared that the witness had not been able to see the car because it was completely covered with dirt and mud, and the witness had not descended into the sinkhole to inspect the vehicle at a closer range; thus, the witness lacked knowledge upon which to base an estimate of market value of the car. The court stated:
 ". . . For a witness to give accurate and dependable testimony it is essential and required that he should be possessed of adequate and reliable knowledge regarding the matter to which his testimony relates. Under some circumstances this may address itself to the probative value of the evidence, but when it clearly appears, as in the instant case, that it is based on unobtained and unobserved factual data it must go to its admissibility. Our courts are committed to the rule that it is proper to exclude on motion the testimony of a witness, if it should later appear in the progress of the trial that the witness did not possess competent knowledge and information upon which to base his statement." 34 Ala. App. at 16-17, 37 So.2d at 676 (citations omitted).
Mr. Clark purchased and lived in the mobile home. These factors are sufficient to support an opinion as to value. Any lack of familiarity with the mobile home industry relates to the probative value of the testimony rather than its admissibility. We find no error in the action of the trial court refusing to exclude Mr. Clark's testimony.
Another aspect of this issue is Mr. Clark's negative response to the question: "All right, do you really know what the market value would have been with these defects?" Mobile Home Brokers contends that the negative answer to the question posed shows conclusively that Clark had no knowledge of the market value of the mobile home at the time of purchase in its defective condition and therefore there is an absence of evidence on this necessary element of the claim. We do not agree. To adhere to Mobile Home Brokers' suggestion would require that we ignore Clark's other testimony on this point which is contradictory to that pointed out above. We believe the correct principle of law to follow in reconciling, if possible, this contradictory evidence is set out in McLarty v. Wright, 56 Ala. App. 346, 349,321 So.2d 687, 689 (1975):
 "Unexplained contradictions in a witness' testimony do not cancel out the matter contradicted or justify its exclusion, but go instead to the weight of the testimony, Bohanan v. Dodd, 7 Ala. App. 220, 60 So. 955 [1913]. Of course, the net effect of inconsistent testimony may be a diminution of the witness' overall credibility, but this is to be determined by the jury."
See also Hines v. Miniard, 208 Ala. 176, 94 So. 302 (1922).
We believe that the credibility and reliability of all of Mr. Clark's testimony was for *Page 1160 
the jury to evaluate and the trial court properly refused to exclude it.
Mobile Home Brokers' second issue concerns the sufficiency of the evidence to sustain the verdict and judgment of $8,500. Its position is that Title 7A, Section 2-714, Code of Alabama 1940 (Recomp. 1958), provides that the measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted. Since there was no proof of the value of the mobile home with its latent defects at the time it was purchased, there was no evidence upon which the jury could properly award damages for breach of warranty. Citing Continental Volkswagen, Inc. v.Soutullo, 54 Ala. App. 410, 309 So.2d 119 (1975), defendant says that omission of proof of damages cannot be supplied by speculation of the jury. Therefore, there is no evidence to support the jury award. We again disagree.
As we have just related above, Mr. Clark did testify about the value of the mobile home with its latent defects on May 14, 1975, the date of purchase. We said the weight to be given that testimony was for the jury. The jury apparently gave credence to this testimony for it returned a verdict for $8,500, and the trial court apparently believed it also for it denied the motion for new trial. It is well known that the correctness of a jury's verdict is strengthened by the refusal of the trial court to grant a new trial. Prescott v. Martin, Ala.,331 So.2d 240 (1976). Therefore, we conclude the trial court did not err in refusing a new trial on the ground of insufficient evidence to support the verdict.
No reversible error having been pointed out, the judgment of the trial court is affirmed.
AFFIRMED.
HOLMES, J., and PAUL, Retired Circuit Judge, sitting by special appointment, concur.